IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

ALFRED TAKYI,

   Defendant.

CRIMINAL ACTION FILE
NO. 1:23-CR-00402-VMC-JEM-1

UNITED STATES MAGISTRATE JUDGE'S
NON-FINAL REPORT AND RECOMMENDATION

Pending before the Court is Takyi's motion to suppress evidence.[1] (Doc. 20.) For the below reasons, the Court **RECOMMENDS** that the motion be **DENIED**, and that all evidence obtained from Apple, Inc. for the three accounts at issue be ruled admissible.

I.   **BACKGROUND**

The one-count indictment, which was returned by a federal grand jury sitting in the Northern District of Georgia on December 12, 2023, charges Defendant, Alfred Takyi, with conspiracy to commit money laundering between April 2015 and April 2019, in violation of 18 U.S.C. § 1956(h). (Doc. 1.) According to the indictment, Takyi conspired with "others known and unknown" to perpetrate a fraudulent online "romance scam" that victimized dozens of U.S. citizens, and involved laundering over $550,000 in fraud proceeds. (*Id.*) On April

---

[1] The motion was originally sealed, but it was unsealed on April 18, 2024. (Doc. 22.)

15, 2024, Takyi filed the pending motion, seeking suppression of the evidence obtained as a result of a search warrant directed to Apple, Inc. for three of Takyi's Apple IDs. (Doc. 20.) He challenges the search warrant on three grounds, arguing that: (1) the search warrant affidavit fails to establish a sufficient nexus between Takyi's three accounts and criminal conduct, so it does not establish probable cause; (2) the warrant is stale; and (3) the warrant lacks the particularity required by the Fourth Amendment. (Docs. 20 at 6-17; 28 at 1-21.) The government responds that the search warrant affidavit contained "specific and relevant information" showing that evidence of Takyi's alleged criminal money laundering conspiracy would be found in the referenced Apple accounts associated with Takyi, but that even if the warrant was invalid, the *Leon* good faith exception applies. (Doc. 23 at 12-21.) Having been fully briefed, the matter is ripe for review. (Docs. 20; 23; 28.)

## II.   STATEMENT OF FACTS

### A. The affidavit's evidence in support of probable cause

On October 29, 2020, Shawn Mincks, a Special Agent (SA) with Internal Revenue Service–Criminal Investigation (IRS-CI), obtained a search warrant from a federal magistrate judge in the Southern District of Ohio. (Doc. 20-1.) The search warrant was directed to Apple, Inc., and it sought information associated with the following seven Apple IDs: (1) kissmekwame@gmail.com; (2) danieldbee@icloud.com; (3) mccoybillions@yahoo.com; (4) mccoybillions @icloud.com; (5) goodnana@live.com; (6) poduro55@icloud.com; and (7)

poduro56@icloud.com. (Doc. 20-1 at 1-3.) At issue here are three of those seven Apple IDs, which SA Mincks averred were associated with Takyi: (1) mccoybillions@yahoo.com; (2) mccoybillions@icloud.com; and (3) goodnana@live.com.[2] (Docs. 20; 20-1 at 3.) SA Mincks averred that: (1) mccoybillions@yahoo.com "is associated with Takyi," and the account associated with this ID was "backed up to iCloud at least as recently as March 16, 2020"; (2) mccoybillions@icloud.com "is associated with Takyi," and was used as a verification email address for mccoybillions@yahoo.com; and (3) goodnana@live.com "was used at various times by Takyi, Conspirator 5 and Oduro," and "[t]he account was active at least as recently as March 16, 2020." (Doc. 20-1 at 3.)

In the search warrant affidavit, SA Mincks provided information about his training and experience, including that he has been a Special Agent with IRS-CI since 2008, and that he has participated in several investigations involving money laundering of funds "derived from romance and other international fraud schemes." (*Id.* at 2.) SA Mincks also provided information about the federal criminal investigation of "Kwame Ansah, Daniel Boadu, Alfred Takyi, Prince Oduro and others," who are "both known and unknown." (*Id.* at 2, 4.) SA Mincks averred that, based on "interviews and analysis of cell phones, financial records and other documentation," law enforcement believed that the referenced individuals "have been engaged in a conspiracy to commit money laundering in

---

[2] As Takyi points out, the search warrant return does not include mccoybillions@icloud.com; thus, it appears that no data associated with that Apple ID was seized. (Docs. 20 at 3; 20-1 at 30.)

that they have knowingly and willfully facilitated the receipt, concealment and transfer of funds derived from so-called 'Romance Scam' victims," and they also had "personally committed multiple acts in violation of" the money laundering and wire fraud statutes.  (*Id.* at 2, 4.) SA Mincks further averred that the information contained in the affidavit was "either personally known to me based upon my experience, investigative activities, analysis of records and interviews; or it has been relayed to me by other agents and/or law enforcement personnel." (*Id.* at 3.)

SA Mincks explained the "romance scam," averring that the conspirators post fake profiles on various dating websites, and then they either contact victims throughout the United States and other countries, or they entice the victims to initiate contact with them. (*Id.* at 4.)  The conspirators use email, instant messaging services, text messaging, and phone calls to build a relationship of trust with the victims, and once trust is gained, the conspirators convince the victims to provide money, purportedly for various investments, or for other need-based reasons. (*Id.*) For example, the conspirator may tell the victims that the conspirator has located a gold or diamond mine that can make them both wealthy if the victim invests money; or that the conspirator has had financial trouble and needs assistance; or that the conspirator has had legal trouble, is in prison, and needs money to pay off captors. (*Id.*) The victims will then wire transfer, direct transfer, or deposit money into bank accounts throughout the United States that are controlled by the conspirators, and specifically here, are controlled by Ansah, Boadu, Takyi, Oduro, and/or others.

(*Id.*) SA Mincks averred that many of the bank accounts were opened in the names of sham business entities that are controlled by the referenced conspirators, and that the victims who provided the funds had the expectation that the funds would be invested or used to assist their "friend." (*Id.*) When the wire transfers, account transfers, and deposits were received from the victims, the conspirators disposed of the funds through cash withdrawals; checks issued to parties known by the conspirators; transfers to each other and to others not named in the affidavit; international and domestic wire transfers; personal expenditures; and purchases of official checks. (*Id.*) The victims did not receive any return on their investments, or any of their money back, and according to SA Mincks, the loss to all of the victims "exceeds $3 million." (*Id.*)

The affidavit provided the various "companies," and their designated bank accounts, opened by Ansah, Boadu, Oduro, and Tayki. (*Id.* at 5.) Ansah established Pram Group, LLC; Boadu established D.B. Transportation, LLC and Blessed Enterprise; and Oduro established PW Logistics, LLC. (*Id.* at 5-6.) With respect to Takyi, the affidavit explained that, between May 2015 and July 2015, he opened two accounts in his own name, for which he was the sole signer: PNC Bank 7406; and JP Morgan Chase 7036. (*Id.* at 6.) Takyi also established TT Logistics, LLC, and in March 2017, he opened bank account JP Morgan Chase 2295 in that name, for which he was the sole signer. (*Id.*) Between December 2013 and February 2015, Ivory Starkes, Takyi's wife, opened JP Morgan Chase 0917, for which she was one of three signers, and 5008, for which she was the sole signer. (*Id.* at 6-7.)

SA Mincks averred that, according to the evidence, including information received from victims and from bank records, he believed that Ansah, Boadu, Takyi, and Oduro, specifically, knew that the funds they received into their bank accounts were derived from unlawful activity. (*Id.* at 4, 7-15.) SA Mincks based that conclusion on the fact that "the funds were not used in the manner promised to the victims," and also on the fact that, after receiving the funds, Ansah, Boadu, Takyi, and Oduro conducted financial transactions, which SA Mincks discussed in the affidavit, that were "designed to conceal the nature, source, location and control of the funds, including purchases [of] official checks; cash withdrawals; and transfers or wire of funds to other individuals and entities." (*Id.* at 4-5, 7-15.)

The affidavit described what happened to 22 different victims; specifically, it described what happened to victims 1-20, 31, and 32. For example, SA Mincks averred that Person 31 [a victim] began a relationship with someone he/she met on a dating website, who he/she believed was named Christopher Bell. (*Id.* at 7.) Person 31 and Bell communicated in various ways, including through email, and Bell told Person 31 that he was working on a contract to build oil and gas pipelines in Ghana. (*Id.*) Bell asked Person 31 to send him money to pay for customs expenses related to equipment he was having shipped to Ghana, and he/she agreed. (*Id.*) Bank records show that the funds were not used for the stated purpose—paying customs expenses. (*Id.*) Between February 2012 and March 2013, Person 31 wired $280,000 to bank accounts controlled by Ansah. (*Id.*) After receiving the funds, Ansah made cash withdrawals of $6,000 and $3,200; he purchased official checks in the amounts of $25,000, $35,000, $14,970, and

$13,485, all payable to an automobile sales company; and he sent wires in the amount of $21,300 and $20,000 to an automobile sales company. (*Id.* at 7-8.)

Person 32 [a victim] also began a relationship with someone he/she believed was Christopher Bell, and who used the same email address as the Christopher Bell who contacted Person 31. (*Id.* at 8.) Bell told Person 32 that he left to go to Africa to complete a project. (*Id.*) About one month later, Bell asked Person 32 to send him $8,000, and soon after that, he asked Person 32 to send him $100,000 so that Bell could purchase equipment to complete the project. (*Id.*) On June 9, 2014, Person 32 wired $100,000 to a bank account controlled by Ansah. (*Id.*) Bank records show that the funds were not used for the stated purpose—purchasing equipment. (*Id.*) After receiving the funds, Ansah purchased an official check in the amount of $20,000, payable to himself; and he made cash withdrawals of $5,000, and $4,000. (*Id.*)

Person 11 [a victim] met a person he/she believed was named Daniel Roberts on a dating website. (*Id.*) Roberts told Person 11 that he lived in Atlanta, Georgia, but that he had traveled to Ghana and discovered gold. (*Id.*) Roberts asked Person 11 to send money to Ghana to pay for workers and other expenses needed to mine the gold. (*Id.* at 8-9.) Person 11 sent some money, and Roberts continued to ask for more. (*Id.* at 9.) Person 11 continued to send money in the hopes that he/she would get his/her money back. (*Id.*) Person 11 was also contacted by someone he/she believed to be Steven Libicier from INTERPOL. (*Id.*) Libicier told Person 11 to stop sending money to Roberts, but that Person 11 needed to send Libicier money in order to keep Person 11 from being

"blacklisted." (*Id.*) As a result, Person 11 sent money to various recipients over several years as instructed by Libicier and/or Roberts. (*Id.*) Bank records show that Person 11 wired $116,000 to Conspirator 1 on June 24, 2015. (*Id.*) Also, on July 1, 2015, Person 11 issued a check in the amount of $25,000 payable to Pram Group, and that check was deposited into a bank account controlled by Ansah. (*Id.*) Those funds were not used for the stated purpose. (*Id.*) After receiving the funds, Ansah purchased two official checks, each for $5,000, and each payable to an automobile sales company; and he made cash withdrawals of $2,500 and $5,510. (*Id.*)

Person 1 [a victim] was in contact with several individuals about what Person 1 was led to believe were various investments in precious metals. (*Id.*) Person 1 believed that the money he/she provided would fund the transport of precious metals from Africa to the United States. (*Id.*) Person 1 was in contact with a person he/she believed was named Larry Ryan, who worked for a company in Washington, D.C. (*Id.*) Ryan instructed Person 1 to deposit money into accounts held by various people. (*Id.*) Bank records show that between July 2015 and June 2016, Person 1 provided at least $80,000, deposited into bank accounts controlled by Boadu. (*Id.*) The funds were not used for the stated purpose. (*Id.*) After receiving the funds, Boadu purchased an official check in the amount of $5,000, payable to an entity controlled by Conspirator 1; and between July 8, 2015, and July 1, 2016, he made the following nine cash withdrawals: $3,650, $5,500, $3,000, $4,000, $4,000, $4,000, $5,000, $4,000, and $6,250. (*Id.* at 9-10.)

8

Person 2 [a victim] met a person he/she believed was David Warren on a dating website soon after Person 2's spouse had died. (*Id.* at 10.) Warren told Person 2 that he owned a factory that made items from wood, and he asked Person 2 for money for various items, including funding for construction of a new building. (*Id.*) Bank records show that between July 24, 2015, and August 7, 2015, Person 2 deposited $25,000 into a bank account controlled by Boadu. (*Id.*) The funds were not used for the stated purpose. (*Id.*) After receiving the funds, Boadu purchased official checks in the amount of $5,000, payable to Conspirator 1's wife, and $4,950, payable to Conspirator 1; and he made a cash withdrawal of $3,820. (*Id.*)

Between August 2015 and October 2015, Person 3 [a victim] provided $95,000 to a person he/she believed was named "Yoni." (*Id.*) Bank records show that the $95,000 was deposited into a bank account controlled by Boadu. (*Id.*) Person 3 indicated that he/she now has very little money to pay for food or medical expenses, and he/she ultimately left the United States. (*Id.*) After receiving the funds, Boadu made cash withdrawals of $4,500, $8,400, $2,200, $8,000, and $3,000; and he purchased official checks in the amount of $5,000, payable to Conspirator 1, on September 15, 2015, and in the amount of $5,000, payable to Takyi, on October 7, 2015. (*Id.* at 11.) The $5,000 payable to Conspirator 1 was deposited into an account controlled by Conspirator 1, and the $5,000 payable to Takyi was deposited into the PNC Bank 7406 controlled by Takyi. (*Id.*) The records also show that Person 3 wired $18,000 into an account controlled by Conspirator 1. (*Id.*)

Persons 4, 5, 6, 7, 8, 9, and 10 [victims] all had experiences similar to the experiences described by Persons 1, 2, and 3 — i.e., they met individuals online who solicited money for various reasons, and the funds provided were not used for the stated purpose. (*Id.*) Specifically, between February 2016 and December 2017, Person 4 provided $63,700 to Boadu; Person 5 wired $50,500 to Boadu; Person 6 wired $80,500 to Boadu; Person 7 provided checks totaling $182,000 to Boadu; Person 8 met someone online that he/she believed was named Manfed Thompson and provided an official check in the amount of $29,900, payable to Boadu, to help Thompson receive a purported prize; Person 9 deposited $10,000 cash into an account controlled by Boadu; and Person 10 issued a check in the amount of $12,000 to Boadu. (*Id.* at 11-12.) The funds were all deposited into accounts controlled by Boadu, and Boadu conducted financial transactions similar to those described for funds received from Persons 1, 2, and 3. (*Id.* at 12.) Person 11, who had also previously provided funds to Ansah and Conspirator 1, wired $13,000 on May 1, 2018, and $23,800 on May 7, 2018, to Boadu. (*Id.*)

In addition to providing funds to Boadu, Person 7 wired $95,000 to an account controlled by Oduro; and Oduro transferred $49,000 of those funds to other bank accounts he controlled, though the transfers were eventually reversed and the funds returned to Person 7. (*Id.*) Person 8 purchased two official checks in the amount of $30,000 each, which were deposited into bank accounts controlled by Conspirator 5.[3] (*Id.*) Conspirator 5 made cash withdrawals, and

---

[3] SA Mincks averred that Takyi and Conspirator 5 "may be one in the same." (*Id.* at 16-17) SA Mincks based this conclusion on the fact that: (1) Conspirator 5's and Takyi's separate bank account records show the same

purchased official checks payable to automobile sales companies. (*Id.*) On April 25, 2018, Person 9 deposited $59,000 cash into JP Morgan Chase 2295 — an account controlled by Takyi; and Takyi purchased official checks payable to the online salvaged vehicle auction site Copart. (*Id.*)

Person 12 [a victim] met a person he/she believed was named David Lucio through a contact he/she made at a business meeting. (*Id.*) At Lucio's request, Person 12 sent money to a person in London that he/she believed was named Dr. Malik so that Lucio could have an operation. (*Id.*) Person 12 also mailed some checks to an address in Columbus, Ohio believing that he/she was investing in gold. (*Id.*) The funds were not used for the stated purpose. (*Id.*) Bank records show that between January 28, 2015, and May 11, 2015, funds from multiple individuals, including Person 12, were deposited into accounts controlled by Takyi. (*Id.* at 15.) Between June 2015, and July 2015, Person 12 deposited $81,000 into PNC Bank 7406 — an account controlled by Takyi. (*Id.* at 12.) After receiving the funds, on June 26, 2015, Takyi purchased an official check in the amount of $31,750, payable to Oduro; and between July 20, 2015, and September 9, 2015, Takyi made cash withdrawals of $3,000, $3,000, $3,000, $4,750, 8,772, and $31,000. (*Id.* at 12-13.) Person 12 also wired $57,623 to an account controlled by Oduro; and on July 29, 2015, Oduro wired $440,000 to PNC Bank 7406 — an account

---

birthdate (July 21, 1987), address (3303 Dandelion Drive, Columbus, Ohio), phone number (210-842-3873), and email address (goodnana@live.com); and (2) SA Mincks reviewed the signature cards for each, and he found that they "bear a striking resemblance" to each other. (*Id.*)

controlled by Takyi. (*Id.* at 13.) Between December 9, 2016, and August 28, 2017, Person 12 provided over $170,000 to Conspirator 7; and using those funds, Conspirator 7 issued several checks to himself, depositing them into accounts he controlled, he made cash withdrawals, and he wired $40,000 to Oduro. (*Id.*)

Person 13 [a victim] met a person he/she believed was Scott Pace, an American soldier who was in Afghanistan, on a dating website. (*Id.*) Pace first began asking Person 13 for various items, then requested money to pay for hospital bills, travel, and diamonds and gold he had found. (*Id.*) Bank records show that on August 31, 2015, an official check issued by Person 13 in the amount of $20,000 was deposited into an account controlled by Oduro. (*Id.*) The funds were not used for the stated purpose. (*Id.* at 13-14.) After receiving the funds, Oduro made cash withdrawals of $3,000, $2,300, $3,000, and $2,900. (*Id.* at 14.) Between September 16, 2015, and October 2, 2015, Person 13 provided $64,000, deposited into PNC Bank 7406 and JP Morgan Chase 7036 — accounts controlled by Takyi. (*Id.*) After receiving the funds, between September 17, 2015, and September 28, 2015, Takyi made cash withdrawals of $5,270, $7,250, $6,277, and $8,237. (*Id.*)

Person 14 [a victim] met a person he/she believed was Manfred Thompson on a dating website. (*Id.*) Thompson told Person 14 that he worked for the U.S. government in Afghanistan, that he had saved a man's life in Afghanistan, and that the man wished to reward him with a package of diamonds. (*Id.*) Thompson asked Person 14 to send money to pay for various expenses related to the package. (*Id.*) Bank records show that on August 16,

2016, Person 14 wired $5,500 to an account controlled by Boadu. (*Id.*) The funds were not used for the stated purpose. (*Id.*) After receiving the funds, Boadu transferred the funds to another bank account held by a third party. (*Id.*)

Persons 15, 16, 17, 18, 19, and 20 [victims] all had experiences similar to the experiences described by Persons 1 through 14 — i.e., they met individuals online who solicited money for various reasons, and the funds were not used for the stated purpose. (*Id.*) Specifically, on November 28, 2016, Person 15 purchased an official check in the amount of $55,000, payable to Takyi; between May 31, 2017, and June 6, 2017, Person 16 provided $65,000 to Takyi through two official checks in the amount of $32,500 each, payable to TT Logistics; between October 11, 2017, and November 15, 2017, Person 17 provided a total of $171,900 to Takyi through checks issued to TT Logistics and one cash deposit; between January 18, 2018, and January 31, 2018, Person 18 provided a total of $63,000 to Takyi through checks issued to TT Logistics and one cash deposit; and between February 12, 2018, and February 13, 2018, Person 19, on behalf of Person 20, provided a total of $61,000 to Takyi through official checks issued to TT Logistics. (*Id.* at 14-15.) The funds were all deposited into accounts controlled by Takyi, and Takyi conducted financial transactions similar to those described for funds received from Persons 1, 2, 3, 12 and 13. (*Id.* at 15.)

After describing various victims' stories and payments, SA Mincks's affidavit discussed the next steps of the investigation. (*Id.* at 15-19.) On May 3, 2017, law enforcement executed a search warrant at an address associated with Oduro—777 Worthington Woods Blvd., Apt. 215, Columbus, Ohio. (*Id.* at 18.)

Oduro's phone was seized at that time, and later searched. (*Id.*) The phone's call log showed that: (1) between April 26, 2016, and March 23, 2017, Oduro communicated numerous times with Person 12; (2) in a messaging app conversation with another party on November 10, 2016, Oduro sent messages stating Person 12's true name, and "James Randolph"; and (3) on March 1, 2017, Oduro sent three messages via a messaging app to Person 12, stating that his email address was jrand76110@gmail.com in the first message, stating "Love you James" in the second message, and in the third message, imploring Person 12 to find a way to communicate with him without his/her children knowing. (*Id.*) Oduro was interviewed in May 2017, and he stated that he and Takyi were previously business partners, but that they'd had a "falling out." (*Id.* at 16.)

On February 14, 2018, Ansah, Conspirator 1, and others were charged in Criminal Complaints with violations of 18 U.S.C. §§ 1956 and 1957. (*Id.* at 15.) Conspirator 1 was arrested by Customs and Border Protection agents on February 20, 2018, as he attempted to enter the United States from Ghana. (*Id.*) When Conspirator 1 was arrested, his iPhone was seized and later searched. (*Id.* at 15, 18.) The search of Conspirator 1's iPhone revealed that "he took and received photos of documents, screenshots of accounts, audio and video files, and other files related to the activity in which he was engaged." (*Id.* at 22.) The search also revealed that Conspirator 1 was involved in two separate communication strings via the WhatsApp application with Conspirator 2 and an individual later identified as Conspirator 9. (*Id.* at 18.) Bank records show that between June 2016, and February 2018, Conspirator 9 controlled a JP Morgan

Chase account that received over $1,131,000 from several people in the United States and Canada. (*Id.*) SA Mincks averred that he interviewed nine of the individuals who sent funds totaling over $846,000 to Conspirator 9, and their statements were similar to those provided by the victims who provided funds to Ansah, Boadu, Takyi, and Oduro. (*Id.* at 18-19.) Conspirator 9's disposal of the funds through cash withdrawals, wires/transfers, and purchases of official checks, was also similar to the activity Ansah, Boadu, Takyi, and Oduro engaged in after receiving funds. (*Id.* at 19.) SA Mincks further averred that the activity in Conspirator 9's bank account corresponded with the WhatsApp conversations between Conspirators 1, 2 and 9. (*Id.*) Specifically, Conspirator 2 informed Conspirator 1 when victim funds would arrive, and then instructed Conspirator 1 on transacting the funds after receipt. (*Id.*) Conspirator 1 relayed the conversations and instructions to Conspirator 9. (*Id.*)

On March 1, 2018, Ansah, Conspirator 1, and others were indicted and charged with several violations of 18 U.S.C. §§ 1956 and 1957. (*Id.* at 16.) Conspirator 1 pled guilty to one count of conspiracy to commit money laundering in December 2018, and he was interviewed. (*Id.*) Conspirator 1 stated that Conspirator 2 defrauds people throughout the world and receives money into numerous accounts that he controls. (*Id.* at 19.) Conspirator 1 further stated that, between 2013 – 2015, Ansah had arranged for funds derived from romance scams to be sent to Conspirator 1's bank accounts, and Conspirator 1 conducted transactions with the funds as directed by Ansah. (*Id.* at 16.) Conspirator 1 stated

that Oduro and Ansah were friends, and Ansah told Conspirator 1 that Oduro was involved with laundering funds in the same manner as Conspirator 1. (*Id.*)

SA Mincks averred that Ansah, Boadu, Takyi, Oduro and others used various electronic devices to communicate with each other, and with other co-conspirators, including via iPhone and other smart phone applications and software, to facilitate the fraud schemes and money laundering. (*Id.* at 17, 22.) SA Mincks based this conclusion on multiple victims' statements that they communicated with the perpetrators via email, instant messaging services, text messages, and phone calls. (*Id.* at 17.) SA Mincks averred that all of those forms of communication are often accessed through electronic devices, including cell phones. (*Id.*) SA Mincks discussed the WhatsApp application generally, and he averred that WhatsApp is often used by persons engaged in fraud because it allows them to communicate while disguising their true identities. (*Id.*) SA Mincks also discussed the investigation of specific WhatsApp phone numbers, averring that between September 20, 2019, and November 14, 2019, pen registers and trap and trace devices on WhatsApp phone numbers associated with Boadu, Takyi, and Oduro, showed that they used WhatsApp on a regular basis to communicate with numbers based in the United States and in Ghana, and that the communications sent and received included text messages, audio files, video files, and image files. (*Id.*)

In total, the affidavit stated that, between February 2013 and July 2015, Ansah received at least $405,000 into accounts he controlled, from three individuals in the United States. (*Id.* at 7.) Between February 2015 and April 2015,

while he was in Ghana, Takyi received at least $132,000 through his wife, Starkes. (*Id.*) Takyi returned to the United States in April 2015, and between June 2015 and April 2018, Takyi received at least $1,215,726 into accounts he controlled from individuals throughout the United States. (*Id.*) Between July 2015 and February 2017, Oduro received at least $205,000 into accounts he controlled from three individuals. (*Id.*) Between July 2015 and May 2018, Boadu received at least $1,417,024 into accounts he controlled, from individuals throughout the United States. (*Id.*)

## B. The search warrant application's attachments

SA Mincks included two attachments to his affidavit: Attachments A and B. (Doc. 20-1.) Attachment A describes the Apple Id accounts that SA Mincks was seeking to search. (*Id.*) Attachment B identified the things that law enforcement was allowed to seize and was divided into two sections: (1) information to be disclosed by Apple; and (2) information to be seized by the government. (*Id.*) Section I of Attachment B required Apple to produce certain information related to each Apple account, including the contents of "all emails associated with the account from June 1, 2015 through the present date," the contents of "all instant messages associated with the account from June 1, 2015 through the present date," and the contents of "all files and other records stored on iCloud." (*Id.*) Section II of Attachment B contained a number of provisions limiting what the government was entitled to seize from Apple's production. (*Id.*) First, Section II limited the government to seizing only information that constituted "evidence of violations of 18 U.S.C. §§ 1343 (write fraud), 1956 (money laundering), and 1957

(money laundering)." (*Id.*) Second, Section II provided the names of those individuals believed to be committing wire fraud and money laundering (that is, Ansah, Boadu, Oduro, Takyi, and Manfred Thompson), along with the bogus companies in whose names those individuals opened bank accounts (that is, Blessed Enterprise; TT Logistics; PW Logistics; Pam Group; LLC; and DB Transportation), and limited the government to seizing only information relating to acts "occurring on or after June 1, 2015." (*Id.*) Third, Section II listed only six categories of information the government could seize, including information pertaining to communications associated with romantic relationships, online dating websites, investment opportunities, international and domestic banking activity, purchase of goods or services, shipments or mailing, the whereabouts of the proceeds of the same, directions and instructions regarding the transfers of funds for the same, any other communications or information relative to preparatory or continual steps taking in furtherance of the same, and all attachments sent to and from any person including any documentation which appears related to the scheme or with any financial institution regarding the movement of funds; the identity of the person who created or used the Apple ID; evidence indicating how and when the account was accessed or used; records pertaining to the means and source of payment for services; evidence indicating the subscriber's state of mind as it relates to the crime under investigation; and evidence that may identify co-conspirators. (*Id.*)

A United States magistrate judge in the Southern District of Ohio signed the search warrant on October 29, 2020. (*Id.*)

III.    <u>DISCUSSION</u>

As explained above, Takyi challenges the search warrant on three grounds, arguing that: (1) the search warrant affidavit is not supported by probable cause; (2) the information presented in support of probable cause is stale; and (3) the warrant lacks particularity. Each argument is addressed below.

> **A. The search warrant affidavit establishes a sufficient nexus between the accounts and criminal conduct, and thus establishes probable cause.**

First, Takyi argues that SA Mincks's affidavit "fails to establish a sufficient nexus between the accounts and criminal conduct to support probable cause." (Doc. 20 at 6.)

A search warrant affidavit establishes probable cause when, given all the circumstances set forth in the affidavit, there is a fair probability that contraband or evidence of a crime will be located in a particular place. *Illinois v. Gates*, 462 U.S. 213, 230-31, 238 (1983). In making a determination of probable cause, a court must examine the totality of the circumstances. *Id.* at 238. "Although probable cause requires more than suspicion, it does not require convincing proof, and need not reach the same standard of conclusiveness and probability as the facts necessary to support a conviction." *Durruthy v. Pastor*, 351 F.3d 1080, 1088 (11th Cir. 2003)(internal quotations and alteration omitted). "[P]robable cause is a fluid concept," and "as the very name implies . . . deal[s] with probabilities," not "hard certainties." *Gates*, 462 U.S. at 231. Reasonableness is the overriding test of compliance with the Fourth Amendment, and the Supreme Court has approvingly quoted authority equating "probable cause" with "reasonable

grounds to believe," even using the phrases "reasonable cause" and "probable cause" interchangeably. *Zurcher v. Stanford Daily*, 436 U.S. 547, 556-559 and n.6. (1978). The Supreme Court has also "repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review." *Gates*, 462 U.S. at 236. Instead, a magistrate judge's "determination of probable cause should be paid great deference by reviewing courts." *Id.* Affidavits should not be interpreted "in a hypertechnical" manner, and "so long as the magistrate had a substantial basis for concluding that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *Id.* (explaining that the task of an issuing magistrate "is simply to make a practical, common-sense decision whether . . . given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place")(internal quotations and alterations omitted).

Here, Takyi does not assert a lack of connection between himself and the three Apple accounts, but he argues that the search warrant affidavit fails to state a sufficient connection between the Apple accounts and the alleged criminal conduct—wire fraud and money laundering conspiracy. (Docs. 20 at 6-13; 28 at 1-9; *see also* Doc. 20-1.) Takyi points to two deficiencies. First, according to Takyi, though SA Mincks averred that the co-conspirators used electronic devices and iPhones to communicate with each other about fraud, that conclusion was "based only on claims by witnesses that they 'communicated with perpetrators via email, instant messaging services, text messaging and phone calls.'" (Doc. 20 at 10-11.) But "[n]owhere in the affidavit is it alleged that Mr. Takyi

20

communicated with a victim," nor is there any "*factual* allegation" that he communicated via iPhone with the "named coconspirators or others," and SA Mincks's "[g]eneralizations rooted in training and experience cannot carry the day . . ." (Doc. 20 at 10-11) (emphasis in original). Second, Takyi argues that the pen register and trap and trace on his WhatsApp phone number showed only that he communicated with numbers in the United States and Ghana for 24 days in 2019, but no fraudulent transactions for 2019 are alleged. (Doc. 20 at 10-11.)

In response, the government points to the affidavit's explanations that: (1) "Takyi has received over a million dollars from U.S. citizens who were the victims of romance scams," and then "made cash withdrawals, obtained cashier's checks, and made wire transfers to third parties;" (2) the money laundering scheme in which Takyi participated "was part of a larger, connected, conspiracy that included multiple victims and several co-conspirators," and that conspiracy "was tightly connected;" (3) the conspiracy members "used their phones to communicate with victims and each other about the details of the scheme;" (4) Takyi regularly used WhatsApp to communicate with numbers based in the United States and Ghana; and (5) in his training and experience, the Apple ID information "may provide direct evidence of the offenses under investigation," and that conclusion comports with common sense. (Doc. 23 at 12-14.)

Considering the totality of the circumstances, and giving deference to the issuing magistrate's decision as required, the Court finds that the search warrant affidavit provided sufficient probable cause that evidence of the alleged crimes — wire fraud and money laundering conspiracy — would be found in Takyi's

Apple accounts. *See Gates*, 462 U.S. at 230-31. First, the affidavit established that Takyi participated in a fraud conspiracy consisting of, among others, Boadu, Oduro, Ansah, and himself. SA Mincks described how the victims were defrauded in a romance scam and then showed how the victims sent their money to the conspirators. (*See* Doc. 20-1 at 10)(victim P3 sent money to accounts controlled by both Boadu and Takyi); (*id.* at 11-12)(P7 sent money to accounts controlled by both Boadu and Oduro); (*id.* at 12)(P11 sent money to accounts controlled both Boadu and Ansah); (*id.* at 12, 13-14)(P12 and P13 sent money to accounts controlled by both Oduro and Takyi). In addition to the victims' money going directly into accounts controlled by the conspirators, the evidence showed that the conspirators, after receiving the fraud proceeds, forwarded the funds to each other. (*See* Doc. 20-1 at 9-10)(Boadu sent P1's money to Conspirator 1); (*id.* at 10)(Boadu sent P2's money to Conspirator 1 and Conspirator 1's wife); (*id.* at 11)(Boadu sent P3's money to Takyi and Conspirator 1); (*id.* at 13)(Oduro sent P12's money to Takyi). In addition, upon Oduro's arrest, he confessed to being "business partners" with Takyi at one point. (*Id.* at 16.) The evidence thus showed a fraud conspiracy between Boadu, Oduro, Takyi, Ansah, and others.

    Second, the evidence showed that the conspirators used their phones and messaging apps and software to communicate with the victims and with each other. (*See* Doc. 20-1 at 17)("victims communicated with the perpetrators via email, instant messaging services, text messaging, and phone calls."); (*id.* at 7-8, 10)(P3, P31, and P32 communicated with conspirators via email); (*id.* at 7, 8, 10, 13, 14)(P2, P11, P13, P14, P31 met conspirators on internet dating website); (*id.* at

18)(Oduro's phone logs showing that Oduro communicated via messaging apps directly with P12); (*id.* at 22)(Conspirator 1's cell phone showing that Conspirator 1 took and received photos of documents, screenshots of accounts, audio and video files, and other files, and communicated with coconspirators); (*id.*)(Conspirators 1, 2, and 9 communicated with each other as to when victim funds would arrive and instructed each other on what to do once the funds did so).

With respect to Takyi specifically, the evidence presented shows that at least six victims — P9, P13, P15, P16, P17, P18, and P19 — sent money or checks that were deposited into bank accounts controlled by Takyi.[4] (Doc. 20-1 at 12-15.) It is thus reasonable to assume that one of two things happened: (1) Takyi himself told the victims to send money to his accounts; or (2) one of the co-conspirators told the victim to do so. In the first instance, there is a fair probability that evidence of Tayki's conversations with the victims would be in the iCloud accounts. In the second, there is a fair probability that Takyi would have communicated his account specifics to the co-conspirator who was speaking directly to the victims, and thus there is a fair probability that these communications would be in the iCloud accounts, as would the co-conspirators' communications to Takyi about when the victims' money would arrive, where, and how much. Indeed, it would be utterly *un*reasonable to conclude that no

---

[4] Victim P8 also sent money directly to Conspirator 5. (Doc. 20-1 at 12.) As explained above, evidence exists to reasonably conclude that Conspirator 5 is Takyi, which would increase this number to seven victims.

evidence would be found in Takyi's Apple ID accounts. *See United States v. McCall*, 84 F.4th 1317 (11th Cir. 2023)(assuming, without deciding, that probable cause did not exist, but noting, "[i]f there is probable cause to believe that [the defendant] summoned the gunmen to the scene to commit a robbery, then there is probable cause to believe that he had a preexisting relationship with them," and thus "[i]t is not unreasonable to believe that such a relationship would be reflected in the data stored in his iCloud account," including, not just communications, but also in photographs and video evidence as well).

Takyi's reliance on *Oglesby* does not help him. In that case, the police were investigating a string of robberies when they observed the defendant smash a victim's car window and take the victim's property from inside the car. *United States v. Oglesby*, No. 4:18-CR-0626, 2019 WL 1877228, at *1 (S.D. Tex. April 26, 2019). The police pulled the defendant's car over, arresting him and seizing his cell phone from inside the car. *Id.* The police applied for, and received, a search warrant to search the phone, on which they found photographs of Defendant — a convicted felon — holding firearms. *Id.* The federal government ultimately charged Defendant with possessing a firearm as a convicted felon. *Id.* at *1. The defendant challenged the search warrant, arguing that it did not establish probable cause that the offense being investigated — burglary of the victim's vehicle — would be found on the cell phone. *Id.* at *2.

In *Oglesby*, the only thing in the affidavit connecting the phone to the criminal conduct was that, in the affiant's training and experience, he knows that "it is common" for suspects to make phone calls or text messages about their

crimes. *Id.* at *4. Importantly, there was no evidence anywhere to suggest that the defendant worked with any conspirators when burglarizing the vehicle. *Id.* at *9. And as the court noted, "it unlikely that anyone would have to Google 'how to break into a car' to come up with the idea to smash a rear window." *Id.* at *9.

Compare that case to this one, where the co-conspirators worked together and had to — indeed, did — communicate with each other. In fact, given the complexity of the scam, it is highly improbable that the conspirators could have done what they did — defraud the victims, direct the victims on where to send money, and then instruct each other on what to do after the money was sent — without communicating with the victims and the conspirators on their cell phones, messaging apps and software, and other data housed in the Apple ID accounts. The affidavit thus establishes a sufficient nexus between the accounts and the criminal activity, thus providing probable cause.

## B. The information in support of probable cause is not stale.

Tayki next argues that the warrant is stale. (Docs. 20 at 13-14; 28 at 10-14.) Specifically, Takyi asserts that "the last of the suspicious financial activity that SA Mincks connects to Mr. Takyi was from April 25, 2018, some two and a half years" before the search warrant was signed on October 29, 2020, and that, during that intervening period, "there was no reported questionable activity with any bank account associated with Mr. Takyi." (Doc. 20 at 13.) In response, the government emphasizes that "digital files . . . are qualitatively different" from real property, and that "there existed a more than fair probability that evidence of such conduct still remained on the Apple servers in 2020 — i.e.,

when the Apple Search Warrant application was presented," because "records and data associated with third-party apps may also be stored on icloud" and that the Apple IDs were backed up and active in March 2020 — just months before the warrant was presented." (Doc. 23 at 17.)

"The staleness concept is just a commonsensical metric for evaluating probable cause in a search warrant application — the supporting information must be timely in order to believe that a fair probability exists for finding particular evidence at a particular place." *United States v. Khateeb*, No. 8:14-CR-185-T-23MAP, 2015 WL 6438755, at *4 (M.D. Fla. Oct. 10, 2015). When reviewing staleness challenges, courts "do not apply some talismanic rule which establishes arbitrary time limitations for presenting information to a magistrate" judge, rather, courts "review each case based on the unique facts presented." *United States v. Harris*, 20 F.3d 445, 450 (11th Cir. 1994). Facts to be considered in this case-by-case determination include, "the maturity of the information, nature of the suspected crime (discrete crimes or ongoing conspiracy), habits of the accused, character of the items sought, and nature and function of the premises to be searched. *Id.* (citing *United States v. Hooshmand*, 931 F.2d 725, 735-36 (11th Cir. 1991)).

The Court finds that three of these factors — nature of the suspected crime, character of the items sought, and nature and function of the premises to be searched — are determinative here. To begin, these were not discrete acts; instead, the evidence showed an ongoing conspiracy that spanned many years. One victim — P1 — began being scammed by the conspirators as early as 2009,

and P1 continued to send the conspirators money through 2006 — or for seven years. (Doc. 20-1 at 9-10.) The affidavit explained how the conspirators opened bank accounts, often in the name of sham businesses entities, through which to launder the fraud proceeds, and pointed to bank accounts opened from February 2013 through March 2017 — constituting a four-year period. (Doc. 20-1 at 5-6.) And Tayki's own accounts received money from June 2015 through April 2018 — or for a three-year period. (Doc. 20-1 at 7.) The conspirators each used WhatsApp from September 2019 to November 2019, and their Apple ID accounts were backed up to the iCloud as recently as March 16, 2020. (Doc. 20-1 at 3.) There was no reason to believe that the fraud had stopped by the time that SA Mincks presented his search warrant in 2020,[5] but even if it had, there was every reason to believe that the evidence from 2015 through 2018 remained in the Apple ID accounts. As the court in *Khateeb* stated, **a two-year gap between activity and the signing of a search warrant is "hardly relevant" in a "digital age," and "[d]igital files, particularly those stored with an email service provider, are qualitatively different" from other types of files and evidence. 2015 WL 6438755, at \*4.** Thus, the information in the affidavit is not stale.

### C. The warrant is sufficiently particular.

Lastly, Takyi argues that the warrant lacks the particularity required by the Fourth Amendment.

---

[5] Although Oduro told law enforcement in 2017 that he and Takyi had had a falling out, the evidence showed that Takyi continued to receive fraud proceeds after that. (Doc. 20-1 at 15-16.)

"The Fourth Amendment requires that searches "should be as limited as possible." *United States v. Blake*, 868 F.3d 960, 973 (11th Cir. 2017) (quoting *Coolidge v. New Hamphsire*, 403 U.S. 443, 467 (1971)). To that end, a search warrant must "'particularly describe the place to be searched, and the persons or things to be seized.'" *United States v. Betancourt*, 734 F.2d 750, 754 (11th Cir. 1984) (citation omitted in original). This "requirement is aimed at preventing 'general, exploratory rummaging in a person's belongings.'" *United States v. Wuagneux*, 683 F.2d 1343, 1348 (11th Cir. 1982)(quoting *Coolidge v. New Hampshire,* 403 U.S. 443, 467 (1971)). However, the description in the warrant need not be elaborately specific; it need only enable the searcher to reasonably ascertain and identify the things authorized to be searched for and seized. *Betancourt*, 734 F.2d at 754–55. The reviewing court determines de novo whether a warrant lacked the requisite particularity. *United States v. Bradley*, 644 F.3d 1213, 1258-59 (11th Cir. 2011). The Eleventh Circuit instructs that the particularity requirement "be applied with a practical margin of flexibility, depending on the type of property to be seized, and that a description of property will be acceptable if it is as specific as the circumstances and nature of activity under investigation permit." *Wuagneux*, 683 F.2d at 1349.

Takyi asserts that the warrant fails for particularity because it "calls for the seizure and production by Apple of virtually every kind of data that can be found in an Apple account. (Docs. 20 at 14-17; 28 at 14-20.) Takyi also argues that the warrant return "indicates that the government seized all information pertaining to the listed Apple IDs maintained by Apple, Inc. as of 11/2/20."

(Doc. 20 at 16) (citing Exhibit 1.) The problem with Tayki's argument, though, is that it focuses only on Attachment B's Section I, and entirely disregards Section II. True, Section I authorizes Apple to disclose the account, but Section II limits what the government may seize from that disclosure. The two-step process is provided for by the Federal Rules and case law.

Federal Rule 41(e)(2)(B) authorizes the government to initially seize electronically stored information, and subsequently conduct a later, off-site review of that information. Fed. R. Crim. P. 41(e)(2)(B). According to the Advisory Committee Notes, this subsection was intended to create a two-step process whereby "officers may seize or copy the entire storage medium and review it later to determine what electronically stored information falls within the scope of the warrant. Fed. R. Crim. P. 41(e)(2) advisory committee's note to 2009 amendments. This two-step process makes sense given that Apple cannot know what documents are responsive and relevant to the criminal investigation. *See United States v. Beard*, No. 1:20-CR-00351-SCJ-LTW, 2022 WL 18657429, at *2-4 (N.D. Ga. June 3, 2022), adopted by 2023 WL 372914 (Jan. 23, 2023)(involving a two-step process and noting that it would not make sense to require Apple to conduct the search and determine what items the government should ultimately review because "non-governmental employees untrained in the details of the criminal investigation likely lack the requisite skills and expertise to determine whether a document is relevant to the criminal investigation.").

As the government notes, courts in this district routinely uphold the two-step procedure allowing the Government to first obtain disclosure of an

electronic account and subsequently review the disclosure for the items specified in the warrant. *See, e.g. United States . Shemtov*, No. 1:21-CR-0123-JPB-CMS, 2023 WL 8529088, at *5 (N.D.Ga. Jan. 30, 2023), adopted by 2023 WL 7276484 (ND. Ga. Nov. 3, 2023)("[I]t is well-settled that a warrant that requires disclosure of the entire contents of an email account (or permits an imaging of an entire hard drive or phone) and then describes a subset of information that will be subject to seizures after a later, off-site review is reasonable as long as its descriptors are sufficiently specific."); *United States v. Chrisley*, No. 1:19-CR-297-ELR-JSA, 2021 WL 7286226, at *6 (N.D. Ga. Aug. 31, 2021) (finding that two-step warrants are permissible); *United States v. Lee*, No. 1:14-CR-227-TCB-2, 2015 WL 5667102, at *3, 8-10 (N.D. Ga. Sept. 25, 2015)( "Because the warrants authorized the searching agents to review the information obtained from Lee's Gmail accounts only for evidence relevant to the government's investigation of the crime of copyright infringement, and not for evidence of general criminal activity or evidence otherwise defined by some open-ended criteria that would permit a free-range seizure of information from Google's disclosure, they did not allow a 'general, exploratory rummaging' in violation of the Fourth Amendment's particularity requirement.").

Given that the two-step procedure is lawful, the next question is whether Section II's parameters are sufficiently particularized. The Eleventh Circuit has recently explained that there are generally two types of limitations that can particularize an iCloud search warrant: first, "narrowing the search based on the subject matter of the data," and second, crafting a "temporal limitation." *McCall,*

84 F.4th at 1327. Here, the warrant applied both types of limitations. First, Section II authorized the government to seize only information constituting evidence of wire fraud and/or money laundering. (Doc. 20-1, Attachment B, Section II.) Section II further provided those individual names (Ansah, Boadu, Takyi, Oduro, and Thompson) and bogus company names (Blessed Enterprise; TT Logistics; PW Logistics; Pram Group, LLC; and DB Transportation) as the persons and entities engaged in the crimes being investigated. (*Id.*) Section II also limited the government to seizing evidence occurring on or after June 1, 2015.[6] (*Id.)* As *McCall* explained, "[b]y narrowing a search to the data created or uploaded during a relevant time connected to the crime being investigated, officers can particularize their searches to avoid general rummaging. Cloud or data-based warrants with sufficiently tailored time-limitations can undermine any claim that they are the 'internet-era version of a general warrant.'" *McCall.* 84 F.4th at 1328 (quoting *United States v. Blake*, 868 F.3d 960, 973-74 (11th Cir. 2017); *see also Beard*, 2022 WL 18657429, at \*2-4 (finding a warrant to be sufficiently particularized where the warrant instructed Apple to disclose all records and contents, but limited the government to seizing only those records that constituted evidence of the specific crimes enumerated in the warrant); *United States v. Soviravong*, No. 1:19-CR-146-AT-CMS, 2019 WL 7906186, at \*6 (N.D. Ga. Dec. 2, 2019)("By explicitly limiting the scope of what may be searched and seized to evidence of

---

[6] Notably, because P1 was defrauded in 2009, and the conspirators bank accounts were opened in February 2013, the government could also have asked to seize information from before June 1, 2015.

the crimes under investigation, the [warrant] was sufficiently particular to enable the searchers to reasonably ascertain and identify the documents and information authorized to be seized"); *United States v. Rhame*, No. 116CR00067-SCJ-CMS, 2016 WL 11164144, at *21 (N.D. Ga. Dec. 6, 2016), adopted by 2018 WL 1082327 (N.D. Ga. Feb. 28, 2018)) (same); *United States v. Harvey*, No. 1:15-CR-53-TWT-RGV, 2015 WL 9685908, at *13 (N.D. Ga. Nov. 30. 2015), adopted by 2016 WL 109984, at *1 (N.D. Ga. Jan. 8, 2016)(concluding that a search warrant for a cell phone was sufficiently particularized where the property to be seized was limited to evidence of the crimes being investigated); *United States v. Archie*, No. 1:15-CR-338-MHC-CMS, Docket No. 96, adopted by 2016 WL 3086410 at *1 (N.D. Ga. May 31, 2016)(concluding that there was not improper "general exploratory seizure" of the information contained in the defendant's email accounts where the warrant limited the seizure to evidence of illegal activities in violation of specified state laws). Thus, the search warrant is sufficiently particularized.

### D. The *Leon* good faith exception applies here.

Even if the search warrant does not establish probable cause, is stale, or is not particularized, that would not end the matter.

In general, evidence seized through an unlawful search must be suppressed. *United States v. Morales*, 987 F.3d 966, 972 (11th Cir. 2021)(citing *Martin*, 297 F.3d at 1312). But when the law enforcement officers "obtained and relied on a warrant from a neutral magistrate and had no reason to think that probable cause was absent despite the magistrate's authorization[,]" the seized evidence should not be suppressed. *Id.* at 974; *United States v. Leon*, 468 U.S. 897,

925 (1984). In *Leon*, the Supreme Court noted that "searches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." 468 U.S. at 922. The Supreme Court then identified four specific situations in which this good faith exception does not apply, including when the supporting affidavit is "'so lacking in indicia of probable cause as to render official belief in its existence unreasonable.'" *Id.* at 923 (quoting *Brown v. Illinois*, 422 U.S. 590, 610-611 (1975)).

Here, Takyi argues that the affidavit "is so lacking in probable cause as to render reliance on it unreasonable." (Doc. 20 at 12.) In addition, Takyi argues that "the lack of a nexus to the Apple accounts and a total failure to particularize the items sought defeat any argument that *Leon's* good faith exception applies." (Doc. 20 at 17.)

Once again, *McCall* is instructive. In finding that *Leon's* good faith exception applied, the *McCall* Court recognized that, "[b]ecause courts struggle to decide how probable cause and particularity apply to the information that law enforcement collects from a cloud account, it is unsurprising that police officers might struggle as well." *Id.* at 1328. The Court applied *Leon* because, "[g]iven the nature of the search, the connection between the crime and the cloud account, and the likelihood of a preexisting relationship between McCall and the gunmen, investigators reasonably presumed that the warrant was valid." *Id.* And "[e]ven if the warrant violated the particularity requirement, it was not so 'facially deficient' that the officers could not have reasonably relied on its when executing

their iCloud search." *Id.*; *see also Blake*, 868 F.3d at 974 (because whether the warrants violated the particularity requirement was "not an open and shut matter," it was thus "a close enough question that the warrants were not so facially deficient that the FBI agents who executed them could not have reasonably believed them to be valid."). So too here. Even if Takyi's arguments regarding the warrant were successful, the evidence seized still should not be suppressed.

## IV.     CONCLUSION

For the above reasons, the Court **RECOMMENDS** that Takyi's motion to suppress evidence, (Doc. 20), be **DENIED**, and that all evidence obtained from Apple, Inc. for the three accounts at issue be ruled admissible.

Takyi has no further motions pending before me. Accordingly, this case is **CERTIFIED READY FOR TRIAL**.

**SO RECOMMENDED** August 21, 2024.

J. ELIZABETH McBATH
UNITED STATES MAGISTRATE JUDGE

34